**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARANDA OLIVER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **C.A. No.**_____ |
| **v.** | § | |
| | § | |
| **JACK HENRY &** | § | |
| **ASSOCIATES, INC.,** | § | |
| | § | |
| **Defendant.** | § | **(JURY TRIAL DEMANDED)** |

---

**PLAINTIFF'S ORIGINAL COMPLAINT**

---

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff, Maranda Oliver, filing her Original Complaint complaining of Defendant, Jack Henry & Associates, Inc., and in support thereof would show as follows:

**I.
JURISDICTION, PARTIES AND VENUE**

1.1     This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to (i) 28 U.S.C. §1331 and (ii) the Americans With Disabilities Act Amendments Act of 2008, as amended ("ADAAA").

1.2     Plaintiff, MARANDA OLIVER, resides in Houston, Texas. Plaintiff was discriminated against based on her actual disability (dyslexia), record of disability, and was regarded as having a disability in violation of the ADAAA.

1.3     Defendant, JACK HENRY & ASSOCIATES, INC., operates in Texas. Defendant was at all times Oliver's employer within the meaning of said applicable statute.

1.4     Defendant engaged in an industry affecting commerce and employed more than

1

500 regular employees.

1.5    The employment practices alleged to be unlawful herein were committed within this jurisdiction.  Venue is appropriate in this Court.

**VICARIOUS LIABILITY--RESPONDEAT SUPERIOR**

1.6    Whenever in this Complaint it is alleged that the Defendant Jack Henry & Associates did any act or thing, it is meant that the Defendant Jack Henry & Associates supervisors, agents, servants, employees or representatives including but not limited to Human Resources Saunders, Supervisor Tammy Story, and Supervisor Kyle Primes and did such act and/or that at that time such act was done, it was done with the full authorization or ratification of the Defendant Jack Henry & Associates or was done in the normal and routine course and scope of employment of Defendant Jack Henry & Associates' supervisors, agents, servants, employees, or representatives.

1.7    The acts of management were performed while in the employment of Defendant, to further Defendant's business, to accomplish the objective for which said supervisory employee was hired, and within the course and scope of that employment or within the authority delegated to said employee.

**II.**
**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

2.1 Oliver filed a Charge of Discrimination ("Charge") with the EEOC in or about August of 2021.  In said Charge, and the amendments and/or attachments thereto and where applicable, Oliver asserts that she was discriminated against because of her disability.

2.2 After investigating Oliver's Charge, the EEOC issued Oliver a Right-To-Sue letter dated February 25, 2021.  Oliver has exhausted her administrative remedies and files this suit within the statutory limitations period.

### III.
### FACTUAL BACKGROUND

3.1    Maranda Oliver remembers fondly the day she received the offer to work for Jack Henry & Associates, Inc. ("JHA"). She truly believed that if she worked hard, she could turn this opportunity into a long-lasting one. After all, JHA touts itself as "a leading provider of technology solutions and payment processing services primarily for the financial services industry. Our solutions serve more than 9,000 customers nationwide, and are marketed and supported through three primary brands."

3.2    Oliver assumed the role of technical support representative ("TSR") in November of 2019 with an optimistic spirit and determination. She went to work as scheduled and worked as hard as she could.

3.3    Oliver was supervised by Tammy Story (white, female). Supervisor Story was eventually supervised by Kyle Primes (white, male) beginning in or about December 2020 making him Oliver's second line supervisor. Yet even before Mr. Primes began supervising Ms. Story, he played a supervisory role over the TSRs.

3.4    Oliver told Supervisor Story on or about November 18, 2019 that she was dyslexic.

3.5    Mr. Primes singled out, nitpicked, and unduly monitored several of the TSRs including but not limited to the Oliver (African American), John Shaikh (Hispanic), and Kia Mcfee (African American), among others. His targets were noticeably people of color. Said maltreatment adversely impacted the workforce.

3.6    At the time of Oliver's hire, JHA employed about 14 TSRs. Overtime, several TSRs resigned the company or transferred elsewhere within the company. This resulted in a lot more work to be performed by the remaining TSRs.

3

3.7     On or about March 29, 2021, Supervisor Story contacted Oliver about an incident involving TSR Jill Evey. A case came in late in the workday. Oliver received said case. The case had initially been handled by Ms. Evey. JHA's practice was to transfer calls to the TSR who initially worked on a case so that *that* TSR, with the most familiarity and rapport, could finish it. Oliver complied and transferred the call to Ms. Evey. Ms. Evey apparently did not like having to finish the work she started. Upon information and belief, Ms. Evey complained to Mr. Primes. Notwithstanding, Oliver participated on the March 29, 2021 call with Supervisor Story remotely using headphones and explained her rationale for transferring the call to Ms. Evey.

3.8     One day later, Supervisor Primes and Supervisor Story contacted Oliver initially about her being tardy for *that* day. Oliver was indeed tardy. She acknowledged such and explained that she was late dealing with her minor child.

3.9     At JHA, employees have about seven minutes of a grace period from their scheduled start time to begin work. Oliver did not have a concerning history of being tardy beyond the grace period. Oliver felt singled out and shared her beliefs with her supervisors.

3.10    On March 31, 2021, Human Resources Maria Saunders hosted a meeting with Oliver, Supervisor Story and Supervisor Primes. At some point, Oliver was advised that Jack Henry & Associates intended on terminating her. Oliver then explained her version of events including making an outcry that she felt she was being picked on in the two days' prior by her supervisors. For those who did not know, Oliver revealed that she is dyslexic and had been for quite some

4

time. Oliver explained that she was in the process of getting medical requests in place to address her disability.

3.11 After listening to the parties, Human Resources Saunders declined moving forward with Oliver's termination. Human Resources Saunders offered Oliver two weeks off.  Oliver could only afford about two days off and accepted such.

3.12 Oliver returned to work thereafter and continued to perform without workplace accommodations associated with her dyslexia.

3.13 On April 8, 2021, Dr. Michael Giglio noted that Oliver is dyslexic. He added that she requires "extra time for the completion of tasks give her difficulties, and as such needs some additional accommodations. We recommend that she not be given queries or tasks in her current job at your facility more often than every 30 minutes in order to give her an appropriate amount of time to complete her tasks."   Oliver forwarded same to JHA and Cigna Leave Solutions ("Cigna").

3.14 On April 12, 2021, Cigna wrote Oliver acknowledging her request for accommodations under the disability laws. "To make a decision on your request, we will gather medical information and provide that to Jack Henry & Associates (JHA)."

3.15 On April 14, 2021, Oliver signed off on an Accommodation Request form asking for workplace accommodations related to her disability.

3.16 On April 21, 2021, Dr. Giglio made certain recommendations. Oliver wished to have those revisited and revised especially after talking with Human Resources Saunders.

3.17 In a recording on April 27, 2021, Human Resources Saunders noted that the company received accommodations paperwork from her doctor. She claimed JHA

could not accommodate Oliver because her disability is permanent, and the duties in question are essential functions of the job. Ms. Saunders said that she had been in contact with "Nick" about several positions that Oliver may be eligible for at JHA. Human Resources Saunders and Oliver even discussed several positions that Oliver met the minimum criteria for including:

A. A fraud sales position, which the company was moving forward with making another employee an offer.
B. Job #8915's emphasis implementation conversion analyst position, which required 50% travel. Human Resources Saunders can be heard trying to discourage Oliver from applying for such given that travel was expected. In the end, Oliver made it clear that she wanted to be considered for the position and would work out childcare with her mother.
C. Job #8883's technical support representative for digital banking, which required JSource experience. Oliver made it known to Human Resources Saunders that she possessed the requisite experience with JSource from her 10-year tenure at Chase Bank.
D. Job #8960's financial crime solutions sales specialist position, which Oliver had applied for prior to this April 27, 2021 recorded call.
And
E. Job #8969 inside sales, which Oliver had applied for prior to this April 27, 2021 recorded call.

The recording ended with Human Resources Saunders acknowledging the importance that Oliver find work elsewhere within the company or risk termination. Moreover, Ms. Saunders promised to get back to Oliver on job leads regarding the aforementioned vacancies. Importantly, Oliver reminded Ms. Saunders that she had been working satisfactorily since November of 2019 without accommodations as noted in several evaluations and/or oral commentary from her superiors.

3.18 On April 29, 2021, Oliver received an email from Ms. Saunders acknowledging Oliver's wish to have Dr. Giglio revise his recommendations. Surprisingly, Human Resources Saunders added that Oliver was being placed on paid

administrative leave for issues that had been discussed in March of 2021 and had already led to disciplinary action. Ms. Saunders never once mentioned paid leave in said recording two days' prior. Finally, JHA gave Oliver until May 31, 2021 to submit a new request for accommodations.

3.19 On April 29, 2021, Oliver informed Human Resources Saunders that a manager was interested in her but needed permission from human resources for the transfer. Realizing that Oliver was one step closer to finding another position within JHA, Ms. Saunders intentionally sabotaged such an opportunity. She responded back to Oliver for the first time, "Because you are on leave pending documentation from your doctor, we will need to pause this process."

3.20 On May 10, 2021, Oliver once again paid out of pocket for a medical appointment; this time it was with Dr. Pamela Chung. Dr. Chung noted that Oliver really needed to seek medical recommendations from "a Dyslexia specialist" and that such "can take time to schedule." This information was forwarded to Human Resources Saunders.

3.21 Notwithstanding, Human Resources Saunders replied that a decision on Oliver's future with JHA would be made "by May 31st."

3.22 The evidence will show that Oliver looked feverishly for "a Dyslexia specialist" who would satisfy JHA's ask. She informed Ms. Saunders of an appointment scheduled for June 1, 2021.

3.23 JHA gave Oliver a mere one-day extension to get in her paperwork.

3.24 On June 1, 2021, Oliver was evaluated by Hope Clinic. They noted, "Given the variability in complexity between each of her work-related tasks, we are unable to definitely provide specific timetables for task completion while at work. We

7

recommend that she be retained at work, and provided with reasonable accommodations with relation to the time allotted to complete her duties."

3.25   JHA responded back that Oliver was terminated. She was terminated without regards to her work performance with or without accommodations, attendance, and dedication.  And just as troubling, Oliver was discharged while placed on an administrative leave that was unnecessary and that she did not request. Finally, she was terminated while there were viable job opportunities elsewhere within the company.

3.26   JHA is not honest with its stockholders, the public, and the United States Securities and Exchange Commission.

3.27   According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, as of June 30, 2021, JHA had 6,714 full-time employees.

3.28   According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, "Our people and culture strategy focuses on attracting, engaging, and retaining qualified, diverse, and innovative talent at all levels of the Company. We are a committed equal opportunity employer and **all qualified candidates receive consideration for employment without regard to race, color, religion, national origin, age, disability, sex, sexual orientation, gender, gender identity, pregnancy, genetic information, or other characteristics protected by applicable law**."

3.29   According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, "Beyond nondiscrimination compliance, **we are committed to fostering a respectful, diverse, and inclusive workplace in which all individuals are treated with respect and dignity**. In 2020, our President and Chief

8

Executive Officer, David Foss, signed the CEO Action for Diversity and Inclusion Pledge, joining nearly 2,000 other chief executives and presidents who have made a pledge to act on supporting a more inclusive workplace for employees, communities, and society at large."

3.30 According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, "We actively engage our Business Innovation Groups ("BIGs") to **develop attraction and retention practices that exemplify and advance a diverse, equitable, and inclusive culture.** Our BIGs are company-sponsored and employee-driven groups open to all employees. As of June 30, 2021, we had approximately 1,600 unique associates participating in six active BIGs, with five focused on inclusion for specific communities—women, people of color, remote associates, LGBTQ+, and veterans— and one focused on environmental and sustainability topics. While BIGs allow associates to connect and support each other, they also function to address bona fide business problems. For example, these groups work with executive leadership to actively improve our talent attraction processes for prospective employees. They also **provide education, training, and conversation opportunities to all employees to advance diversity, inclusion, understanding, and innovation throughout the Company."**

3.31 According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, "Our success depends not only on attracting and retaining talented employees, but also in **developing our current employees and providing new opportunities for their growth.** We offer our employees numerous live and on-demand training programs and resources to help them build knowledge and

improve skills. These trainings include mandatory programs, such as security awareness, as well as recommended but optional programs, such as a recent training on mitigating unconscious bias that received a high level of participation and led many of our employees to take a personal pledge to support inclusion in the workplace. Self-developer weeks specifically allow employees the opportunity to sign-up for curated courses covering topics such as technology trends and JKHY products and services. Through our BIGs, we also offer opportunities for employees to advance their knowledge of diversity, equity, and inclusion matters."

3.32 According to JHA's President, CEO and Board Chair David B. Foss in its Form 10-K, **"[JHA] emphasizes the safety and well-being of our employees as a top priority.** We define wellness comprehensively and include mental, physical, emotional, financial, psychological, and environmental considerations. [JHA] offers a competitive compensation and benefits package and supports dedicated campaigns that communicate directly to employees about financial wellness, mental health, healthful nutrition and exercise, and other wellness topics."

3.33 JHA failed to honor its aforementioned public declarations and commitments as to Oliver.

**IV.**
**CAUSES OF ACTION**

A. **DISABILITY DISCRIMINATION**

4.1 Oliver repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporate the same herein as though fully set forth.

10

4.2   Defendant, through its agents, supervisors, or employees violated Oliver's civil rights by nitpicking her, denigrating her, disciplining her, removing her from her position, failing to accommodate her, placing her on an administrative leave, harassing her, forcing her to find work "elsewhere" in the company or risk termination, and terminating her, among other things based on Oliver's disabilities - actual, record of and regarded as.

4.3   The above-described conduct created an intimidating, oppressive, offensive, hostile environment, which interfered with Oliver's emotional and physical well-being.

4.4   Defendant at all times relevant hereto had actual and/or constructive knowledge of the conduct described in the paragraphs above in large part because of Oliver's report of misconduct and/or the open and obvious nature of the misconduct that permeated.

4.5   As a result of the hostile and offensive environment perpetrated by Defendant through its agents, supervisors, or employees, and maintained by Defendant's failure to protect Oliver from discrimination and instead denigrating and terminating Oliver causing her to suffer severe emotional distress and injury.

4.6   Defendant violated the law by failing to adequately train, supervise, control, discipline, and/or otherwise penalize the conduct, acts, and omissions of management as described in the paragraphs above.

4.7   Defendant failed to comply with their statutory duty to promptly take all reasonable and necessary steps to eliminate discrimination from the workplace and to prevent it from occurring in the future.

4.8   As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against Oliver through its agents, supervisors, or employees, Oliver has suffered and will continue to experience pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and/or will incur medical expenses for treatment by health professionals, and for other incidental expenses; and she has suffered and/or will continue to suffer a loss of earnings and other employment benefits and job opportunities. Oliver is thereby entitled to general and compensatory damages in amounts to be proven at trial.

4.9   As a further direct and proximate result of Defendant's disability violations, as heretofore described, Oliver has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship with Defendant, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Oliver. Oliver requests that attorney's fees be awarded.

## V.
## JURY DEMAND

5.1   Oliver requests that this action be heard before a jury.

## VI.
## DAMAGES

6.1   Defendant's conduct constitutes violations of statutory and/or common law.  Such unlawful conduct seriously affects Oliver in her occupation, trade and business. Because of Defendant's unlawful conduct, Oliver has suffered, suffers, and will continue to suffer humiliation, mental anxiety and stress, and other damages.  Oliver has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies and procedures of Defendant.  Accordingly, Oliver seeks all

general, special, incidental, economic, compensatory, punitive, and consequential damages in an amount to be proved at trial including punitive damages.

6.2     Because of Defendant's unlawful and tortuous conduct, it has been necessary for Oliver to retain the undersigned attorney to represent her in these causes of action. Oliver has agreed to pay her attorney reasonable attorney's fees for the preparation and trial of these causes, and further for any appeal thereof should same become necessary.

6.3     Additionally, Oliver has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living.  Accordingly, Oliver seeks all general, special, incidental and consequential damages as shall be proven at trial.

6.4     Further, Oliver seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant.  Oliver also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

## VII.
## PRAYER

WHEREFORE, premises considered, Oliver prays that Defendant be cited to appear and answer herein, and that on final trial, Oliver have judgment against Defendant for:

a.     Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any employment practice which includes discrimination on the basis disabilities thereof.

13

b. All damages to which Oliver may be entitled pursuant to this Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

c. Compensatory damages for pain and mental suffering in the past and future;

d. Punitive damages in an amount above the minimum jurisdictional limit of the Court;

e. Reasonable attorney's fees, with conditional awards in the event of appeal;

f. Pre-judgment interest at the highest rate permitted by law;

g. Post-judgment interest from the judgment until paid at the highest rate permitted by law;

h. Costs of court and expert witness fees incurred by Oliver in the preparation and prosecution of this action; and

i. Such other and further relief, at law or in equity, to which Oliver may be entitled, whether by this Complaint or by any amendment hereto.

Respectfully submitted,

Law Offices of Katrina Patrick

*/s/ Katrina S. Patrick*

_____

**Katrina Patrick**
Attorney-in-Charge
State Bar No. 00797218
6575 West Loop South, #500
Bellaire, Texas 77401
Telephone: (713) 796-8218
Facsimile: (281) 399-5537

**ATTORNEY FOR PLAINTIFF**
**MARANDA OLIVER**

15